*In re* CARRIER *et al.*

(*District Court, W. D. Pennsylvania.* June 28, 1889.)

1. BANKRUPTCY—THE ASSIGNEE—ACCOUNTING.

Where the account of an assignee in bankruptcy, at the instance of his successor, was referred to a register to audit, and, if necessary, to restate it, and there was a full hearing before the register, who did not undertake to restate the account until after the lapse of nearly eight years, *held* that, while such inexcusable delay might not operate as an abandonment of the proceeding, yet the court would not sustain any surcharge unless the accountant's liability was indubitably established, and every reasonable presumption would be made in his favor.

2. SAME—JOINT DEBTORS—SET-OFF.

Under the bankrupt law of 1867, where one of two joint debtors becomes bankrupt, the creditor may set off the debt against his separate indebtedness to the bankrupt.

3. SAME—SALE AND PURCHASE BY ASSIGNEE IN HIS OWN RIGHT IN STATE COURT.

Where real estate of a bankrupt came to his assignee in bankruptcy incumbered with prior liens exceeding its value, the assignee himself being one of the judgment-lien creditors, it was competent for the bankrupt court to grant to the assignee leave to proceed in the state court to sell the property on his judgment, and to bid in his individual right at the sheriff's sale.

4. SAME.

Where, in the exercise of such authority, the assignee purchased at the sheriff's sale in his own right and with his own money, and afterwards sold the property at an advance, he is not chargeable in his account as assignee with the profit he thus made, no fraud or misconduct being imputable to him, and the sheriff's sale having been conducted openly and fairly.

In Bankruptcy. *Sur* exceptions to the register's report upon the account of Richard Arthurs, late assignee.

*Jenks & Clark, Miller & McBride,* and *H. C. Campbell,* for exceptants.

*Levi Bird Duff* and *W. S. Purviance,* for report.

ACHESON, J. John Carrier and Andrew F. Baum were adjudged bankrupts on June 22, 1874, and on the 28th day of the succeeding September James Bredin, J. M. Wilcoxon, and Gilles McGregor became their assignees in bankruptcy. These assignees were successively discharged, and on February 19, 1877, Richard Arthurs was appointed the assignee. He acted in that capacity until April 12, 1880, when, upon his own petition, he was discharged from the trust, and Levi Bird Duff was then appointed assignee. On August 5, 1880, Arthurs filed his final account in court, and on November 11, 1880, he filed with the register a similar account, but in a more formal shape. The account showed a balance of $1,275.78 in the hands of the accountant. Shortly thereafter he honored a draft for $1,000 which his successor drew on him; and thus there then remained in his hands, apparently, the small balance of $275.78 only. On March 4, 1881, the new assignee presented his petition to the court, setting forth that he had reason to believe that Arthurs' account was incorrect, and he annexed to his petition specifications of objection thereto; and thereupon, at his instance, the court made an order referring the account and objections to the register, who was directed

to examine the same, and to audit, and, if necessary, to restate the account. Soon after the date of this order the register proceeded thereunder. Mr. Arthurs was called before him, and was subjected to a rigid examination in respect to his account and all the transactions connected with or involved in the administration of his trust. His disclosures appear to me to have been frank and full. A number of other witnesses were examined, and a large amount of documentary evidence was submitted. The taking of testimony in the matter ended on October 18, 1881, and the register was then fully advised as to all the facts, as was also the present assignee, who had instituted and conducted the investigation.

If a proper case was made out for surcharging the accountant, such action should have been taken promptly. This was imperatively required by the policy of the bankrupt law, which contemplated that two years were a reasonable period for the settlement of the estates of bankrupts. *Bailey* v. *Glover*, 21 Wall. 342, 347. But here nearly eight years elapsed before the register undertook to restate Mr. Arthurs' account, for it was not until April 5, 1889, that he filed his report surcharging the accountant with large sums, the balance reported against him being $26,604.46. Of this unexplained laches the accountant justly complains. He had, indeed, good right to suppose that the attempt to surcharge his account had been abandoned. But, while such may not be the legal conclusion deducible from a delay so unreasonable, still, at the threshold of this discussion, I do not hesitate to declare that at this late day no surcharge should be sustained here unless the accountant's liability is indubitably established. After so great a lapse of time every reasonable presumption should be made in favor of the accountant. With these preliminary observations, I now proceed to consider the several items of surcharge, but in a somewhat different order from that in which they are discussed in the register's report.

1. The two bankrupts and Alexander McClure were owners as tenants in common of certain timberlands in Clearfield county, Pa., each owning the undivided one-third part. During the winter of 1877 one McCrackin, under some adverse claim of right, went upon these lands and cut, manufactured, and rafted 27 rafts of square timber. This timber having been run into Jefferson county, Pa., a writ of replevin therefor was sued out of the court of common pleas of that county at the suit of Arthurs, as assignee, and McClure, and upon their giving security the sheriff delivered the timber to them, and they jointly ran it to Pittsburgh, some of the rafts arriving there in the spring, and the rest in the fall, of that year. At Pittsburgh, P. R. Bohlen caused a writ of replevin for this timber to be issued out of the United States circuit court, making Arthurs and McClure defendants. McClure gave security to the marshal, who thereupon left the timber in the defendants' possession. It does not appear when the action of replevin in Jefferson county was tried, but it resulted in a verdict for the plaintiffs. The suit in the circuit court was tried at May term, 1878, when a verdict was rendered for the defendants. But there was a motion for a new trial, which was not dis-

posed of until June 25, 1879, when it was denied. Then, upon judgment being entered on the verdict, the plaintiff sued out a writ of error to the supreme court of the United States, and the litigation was not terminated until November 23, 1885, when the judgment was affirmed. *Bohlen* v. *Arthurs*, 115 U. S. 482, 6 Sup. Ct. Rep. 114. In his account as assignee Arthurs charged himself with the proceeds of 10 of these rafts of timber. He sold no more, and received none of the proceeds of the others. McClure took into his possession 14 of the rafts, and he afterwards appropriated them to his own use. He subsequently (about January 1, 1879) made a voluntary assignment for the benefit of his creditors. The bankrupt Baum sold three of the rafts, and kept the proceeds. The register charged the accountant with 18 rafts. This charge is based mainly upon two findings of fact made by him, viz.: *First*, that after the rafts reached Pittsburgh the joint ownership of Arthurs and McClure ceased by reason of an actual division which they made of the rafts between themselves; and, *secondly*, that Baum was the agent of Arthurs and McClure to sell the three rafts he disposed of. But I do not concur with the register in either of these conclusions. There is not a particle of direct evidence in the case to show that there was any division of the rafts, and the positive testimony of Arthurs is to the contrary. The register rests this finding upon the entry in Arthurs' account and on certain bills of measurement. But there is nothing in either inconsistent with the fact of continued joint ownership, and, indeed, nothing to indicate that the assumed division ever took place. Nor is there any proof of Baum's alleged agency. The uncontradicted evidence is that Arthurs and McClure left bills of sale for these rafts at the Second National Bank of Pittsburgh, to be delivered by the bank to any purchaser upon payment of the price to the bank, and they put men upon the rafts to take care of them. Baum was simply told by Arthurs and McClure that if he found purchasers to take them to the bank. Without the slightest authority from any one, he took away the three rafts from the place where they were moored, and disposed of them. The fact did not come to the knowledge of Arthurs (who lived in Jefferson county) until late that fall or in the spring of 1878.

Under the peculiar circumstances of the case, I am not satisfied that Arthurs was guilty of any negligence creating liability on his part. As joint owner McClure had an undoubted right to take possession of the 14 rafts. Moreover, he had given security to the marshal, and thus relieved the rafts from the Bohlen writ of replevin. Again, the title was in litigation, and that litigation had not ended when Arthurs retired from his position as assignee in bankruptcy in April, 1880. McClure made an assignment for the benefit of creditors, as early as January, 1879, and nothing was then to be gained by a personal suit against him. Baum was utterly insolvent, and it does not appear that any good result would have followed any attempt to pursue the persons to whom he sold the three rafts. Arthurs paid most of the expenses incurred in running the rafts to Pittsburgh, etc., and he took credit for the same. It is admitted that these expenditures were reasonable. Yet the register charged

Arthurs with $697.61 for the purpose of reducing his credit to two-thirds only of the whole expenditures. But for the reasons above indicated I am of the opinion that Arthurs is justly chargeable only with the net amount he realized from the 10 rafts, and I am unwilling to sanction any of the surcharges based on this transaction.

2. By written agreement dated September 1, 1868, A. F. Baum sold to John B. Campbell an interest (the undivided one-third) in a saw-mill, lands, and certain timber situated in Jefferson county, and Campbell agreed to deliver to Baum, at Pittsburgh, 5,000,000 feet of boards, 500,-000 feet in the spring of 1869 and the like amount annually thereafter until the whole quantity was delivered; and Baum afterwards, for the benefit of Campbell, entered into a contract with R. J. Nicholson to manufacture the lumber. On May 12, 1874, Baum assigned to Richard Arthurs 2,750,000 feet of the boards coming to him under the Campbell contract as collateral security for the sum of $3,875.93, then paid by Arthurs to Baum, and the further sum of $6,667.23, the amount of three judgments against Baum, which the Deposit Bank of Clarion had entered up in Jefferson county. These judgments Arthurs then paid, and the bank assigned them to him. On the same day Baum and Arthurs signed a paper, which, after reciting the assignment, reads thus:

"The said Arthurs is to sell said boards and pay out any liens or debts that the said Baum may be liable for, such as Sulger's, and any liens that may now be entered in the common pleas of Jefferson county, after taking expense which he is to have, 15 per cent. for advances and personal attention, besides anything he may expend on the same, and, if any balance, to pay the same to A. F. Baum."

On May 21, 1874, Arthurs, with Baum's knowledge and consent, advanced to Campbell $5,100 for the purpose of paying Nicholson the expense of manufacturing the lumber, and on June 1, 1874, Arthurs advanced for Baum to Sulger $3,074.14. The fourth specification of objection to Arthurs' account relates to the Campbell boards, and, after stating that the said assignment of May 12, 1874, was made "as security for a certain debt which Baum owed him," (Arthurs,) it alleges that the latter received under the same more than was sufficient to pay his debt, and that "he [Arthurs] should render an account of said lumber, and make a statement of his debt, and account to said Baum's estate for the surplus." During the hearing before the register, Arthurs submitted an account covering the whole transaction, and to the correctness of the same he testified. This account shows a large balance in favor of Arthurs. The register adopted it as the basis of his report upon this branch of the case, but he so modified it that he produced a balance against Arthurs of $1,680.18, and with this sum he charged him.

After a patient examination of all the items of the account and the proofs touching the same, I am unable to agree with the register in the result here reached by him. In the first place, the register undertook to restate the account between Arthurs and Campbell by making deductions for alleged usurious interest. But that account seems to be perfectly satisfactory to Campbell, and I do not see that it was within the

province of the register to readjust it. As he carried the supposed balance due Campbell into the account, as stated by him between Arthurs and Baum, the effect was to give the latter a credit of $367.76, to which he was not entitled. Again, he restated the interest account between Arthurs and Baum so as to deprive the former altogether of the benefit of that provision of the contract which gave him "fifteen per cent. for advances and personal attention." True, Arthurs did not sell the boards as was originally intended, but the change in the mode of executing the contract had the consent or sanction of all the parties in interest, and I see no reason why Arthurs was not entitled to the stipulated compensation for his trouble, which was very great. Furthermore, I think the evidence does not fairly warrant the charge against Arthurs of $494.48 —the principal and interest of Darrah, Moore & Co.'s note. Before that note matured the makers had become bankrupt, and Arthurs handed it to Baum, saying he might make the best of it. It is not shown that Baum realized a farthing out of it. In fact the note seems to have been worthless, and was so regarded by every one. Then again, the charge against Arthurs of $564.16, the principal and interest of the Edelblute note, is of very doubtful propriety, even upon the register's own statement of the case; and in view of Campbell's positive testimony that Arthurs did not receive it, it does seem to me that the register ought not to have debited the latter with it. Still further, in his statement of the account between Arthurs and Baum the register, as he himself mentions in his report, "only included such items as relate to the arrangement of May 12, 1874." Hence he ignored certain credits which Arthurs claims, and among these a credit of $1,000, the amount paid to redeem lands from a tax-sale, and a credit of $2,049, the balance due on McCrea & Co.'s notes. The register assigns as his reasons for disregarding these claims that they were not explained, and that they did not "belong to the question arising under the arrangement of May 12, 1874;" and he says:

"I do not presume to consider whether they are right or wrong as claims that Arthurs may prove against the bankrupt's estate."

But if these are provable claims against Baum's estate in bankruptcy, then Arthurs is clearly entitled to set them off against his liability, if any, to Baum under the contract of May 12, 1874, Rev. St. § 5073; Blum. Bankr. 282, 283. Now, in fact these two specified items are very fully explained in the evidence. By deed dated January 1, 1874, containing the usual covenants for title, Baum, for the consideration of $6,000 paid to him by Arthurs, sold and conveyed to the latter certain lands in the state of Michigan. But those lands, as Arthurs afterwards discovered, had been previously sold for taxes, and Arthurs was compelled to pay $1,000 to redeem them. This payment, it is true, was made after Baum was adjudged a bankrupt, but Baum's covenants were broken at the date of the delivery of his deed, and I cannot doubt that his liability here was a provable debt against his estate in bankruptcy. Then as to McCrea & Co's notes. They were produced before the regis-

ter, and given in evidence. They were discounted before Baum's bankruptcy by Arthurs. They bear Baum and Osborne's indorsement, and the balance due thereon is as above stated. Baum and Osborne, indeed, are joint debtors of Arthurs, but it is settled that a joint indebtedness may be proved and set off against the estate of either of the joint debtors who may become bankrupt. *Tucker* v. *Oxley*, 5 Cranch, 34; *Gray* v. *Rollo*, 18 Wall. 629. Therefore Arthurs is entitled to set off the debt of Baum to him on the McCrea & Co. notes against his own indebtedness to Baum. Id.

I have now gone far enough to show that the surcharge of $1,680.18 cannot stand, nor any part of it, and hence I deem it unnecessary to consider the question arising upon the register's report, whether the assignment of May 12, 1874, created such a confidential relation between Baum and Arthurs in respect to the lands embraced in the Campbell contract as would preclude Arthurs from purchasing in his own behalf at the tax-sale, and make him chargeable with the sum he realized by his resale.

3. Means & Nicholson brought suit against Andrew F. Baum in the court of common pleas of Jefferson county, and therein obtained an award of arbitrators for $3,226.46, which was filed August 13, 1873. From this award Baum appealed, and on the 22d day of September, 1874, upon a trial in court, there was a verdict for the plaintiffs for $3,440.48, and for this sum judgment was entered. This judgment was assigned by the plaintiffs to Arthurs on January 13, 1875. The register finds that the date of Arthurs' purchase of the judgment was January 13, 1874; but in this he is undoubtedly mistaken. He relies very much upon a letter from Arthurs to Baum, notifying the latter of the purchase, which letter bears date January 13, 1874. It is, however, satisfactorily shown that there was a mistake in this date as to the year. I do not regard the date of the purchase as a matter of controlling importance, but that it actually was January 13, 1875, is established by the direct and positive testimony of all the parties to the transaction. Arthurs paid for the judgment the sum of $2,000, and this was his own money. This is not disputed. It is clear, also, that he bought the judgment for himself. At the time of the purchase Arthurs had no money in his hands belonging to Baum. The account as stated by the register shows that at that time he was in advance to Baum to an amount exceeding $13,000. It will be observed that the transaction took place more than two years before Arthurs became the assignee in bankruptcy. Out of the proceeds of a sheriff's sale of certain real estate of Baum, which occurred in November, 1879, and which will be more particularly referred to hereafter, Arthurs received the whole amount of this judgment, viz., $4,572.24. The register holds that he was entitled to collect from the estate of the bankrupt only the amount of money he invested in the judgment, with interest, and therefore he charged him with the excess, to-wit, $2,089.82. The register bases this decision upon the alleged ground that in respect to this judgment Arthurs stood to Baum in a confidential relation of a twofold nature,—first as his counsel or attorney at

law, and then as his trustee under the assignment of May 12, 1874. But the evidence, taken as a whole, most clearly shows that the relation of attorney and client never existed between Arthurs and Baum in respect to the Means & Nicholson judgment. Arthurs was not the attorney of record nor was he consulted by Baum about the case. Neither was he the general counsel or attorney of Baum. Occasionally Baum employed Arthurs, as he did many other lawyers. Besides, even if such relation existed, it was dissolved by the adjudication of Baum, as a bankrupt, in June, 1874. Again, Arthurs was not Baum's counsel in the transaction of May 12, 1874, and the assignment of that date simply created the relation of creditor and debtor between them. Such is the view advanced in the fourth specification of objection. At the date of said assignment the claim of Means & Nicholson was still in litigation, and Baum denied and was contesting his liability to them. From the terms of the papers executed on May 12, 1874, the circumstances surrounding the transaction, and the parol testimony relating thereto, I am well satisfied that the Means & Nicholson award was not one of the liens within the contemplation of the parties. But what if it was one of them? Arthurs was under no sort of obligation to discharge liens until he himself was reimbursed his advances. But not only had he no funds of Baum in his hands when he purchased the Means & Nicholson judgment, but he never had any surplus out of the Campbell boards to apply to that judgment. Finally, here, there is no specification of objection relating to this matter. In my opinion, then, this surcharge is most clearly wrong.

4. By an agreement in writing, dated November 6, 1866, Andrew F. Baum sold and agreed to convey, upon payment of the purchase money, his undivided interest in certain lands in Jefferson county, Pa., known as the "North Fork" property, to E. G. Carrier. This matter stood open when Baum was adjudged a bankrupt, at which time his interest was heavily incumbered with liens, and it passed to his assignees in bankruptcy so charged. Shortly after Arthurs became assignee by an agreement between him and E. G. Carrier, dated March 21, 1877, the balance of purchase money was fixed at $20,000, payable in four equal yearly installments. The register's report shows, and the fact is, that the amount of liens against Baum's interest, which had attached prior to his adjudication as a bankrupt, and subject to which the assignees took title, was in excess of its value. I may add that such excess was large. These liens were kept alive. The second of them was the Means & Nicholson award, which, it will be remembered, was filed August 13, 1873. It appears that by deed dated and acknowledged August 13, 1873, and duly recorded on the 15th of the same month and year, Andrew F. Baum and wife, for the recited consideration of $20,000, conveyed to Jake Hill all their estate and interest in the North Fork property. It does not appear at what hour of the day this deed was delivered or the said award was filed, and which was the earlier in time is undetermined. On June 9, 1875, the Pittsburgh National Bank of Commerce obtained a judgment in the court of common pleas of Jefferson county against Jake

Hill, and under judicial proceedings upon that judgment the sheriff sold Hill's interest in the said lands to the bank, and executed to the bank deeds therefor, dated December 16, and acknowledged in open court on December 23, 1875. On November 18, 1874, the then assignees in bankruptcy of Baum presented a petition to the bankrupt court, alleging that the said conveyance from Baum to Hill was in trust for the former, etc., and thereupon a restraining order was issued by the court against Hill. Whether it was served does not appear, but at that point this proceeding stopped, and nothing further was done therein until November 13, 1877, nearly two years after the bank had acquired Hill's title, when, upon Hill's voluntary answer to said petition, the bankrupt court made a decree adjudging that the deed of August 13, 1873, from Baum to Hill, was void for want of consideration, and as a fraud upon Baum's creditors. But it does not appear that the bank ever had any notice or knowledge of this singular proceeding, and it seems very clear that it was not affected by the decree of the bankrupt court. In this condition of affairs Richard Arthurs presented his petition on April 9, 1879, to the Hon. W. W. Ketch. m, the then United States district judge for this district, sitting in bankruptcy, setting forth his ownership of the Means & Nicholson judgment, and the facts connected with its original entry, and the revival thereof, the interest which the bankrupt Baum had in said North Fork property, and the said agreement of March 21, 1877, fixing the amount of purchase money coming from E. G. Carrier; that Baum's interest was subject to the lien of a large number of judgments, amounting to more than said unpaid purchase money; that by reason of the liens and legal complications he (Arthurs) was unable to make title to E. G. Carrier; and that he refused to pay the purchase money, or any part of it, and praying leave to proceed on his lien in the court of common pleas of Jefferson county, and to sell thereon Baum's said interest. Subsequently the bankrupt court made the following order:

"And now, June 21, 1879, the objections filed by John Wilson and S. P. Fulton, Esq., to the application of Richard Arthurs for leave to issue writs of execution on judgment No. 75 of Sept. term, 1878, court of common pleas of Jefferson county, entitled Means & Nicholson, for use of Richard Arthurs, vs. A. F. Baum, having been withdrawn, and on due consideration of said petition it is hereby directed that said Richard Arthurs, assignee of said bankrupt, have leave to issue all necessary writs of execution required to sell the interest of said A. F. Baum, bankrupt, in certain purchase money due from E. G. Carrier on a certain article of agreement for the purchase of what is known as the North Fork property in Jefferson county, and said Richard Arthurs, assignee of said bankrupt, has leave to bid at said sale in his individual right, giving due notice to bidders of his intention on the day of sale. PER CURIAM."

Accordingly, on June 26, 1879, a writ of *fi. fa.* was issued out at the court of common pleas of Jefferson county upon the Means & Nicholson judgment, and a levy was made on Baum's interest in said property, and, after inquisition and condemnation, upon a writ of *vend. ex.*, the sheriff of said county on November 6, 1879, sold Baum's said interest to Richard Arthurs for the sum of $9,500, and by deed dated Novem-

ber 24, 1879, and acknowledged in open court February 19, 1880, the sheriff conveyed the same to Arthurs, who paid to the sheriff his bid, $9,500. The sheriff paid the same into the court of common pleas, and by that tribunal the fund was distributed among the lien creditors. By deed dated April 19, 1880, but not acknowledged or delivered until August 7, 1880, Richard Arthurs, for the price of $16,000, conveyed the title he had thus acquired to Cassius M. Carrier.

The register decides that Arthurs is accountable to the estate of the bankrupt for the whole of the Carrier purchase money as fixed by the agreement of March 21, 1877, with interest, less the $9,500 he paid to the sheriff, and accordingly he has surcharged Arthurs with the sum of $17,148.93. The register proceeded upon the idea that here was a good security of the value of $20,000, available to the estate of the bankrupt Baum,—a secured debt which the assignee Arthurs might and should have collected. This erroneous notion pervades his report. The register was strangely oblivious to the fact that Baum's interest in this property came to his assignees in bankruptcy burdened with liens much beyond its value, and that to his estate in bankruptcy, or, in other words, to his general creditors, it was an absolutely worthless asset. In suggesting that Arthurs was censurable because he did not sue E. G. Carrier, the counsel overlooked the authoritative decisions which show that he could not have maintained the action without removing the liens. *Withers* v. *Baird*, 7 Watts, 227; *Magaw* v. *Lothrop*, 4 Watts & S. 316; *Garrett* v. *Crosson*, 32 Pa. St. 373. That Arthurs had any funds of the estate in his hands with which to discharge the liens, even if that had been a wise thing to do, is not pretended. The fact is in the incumbered condition of the title the only persons who had any real interest in this security were the lien creditors. Hence it was that the prior assignees in bankruptcy, who had had charge of the bankrupt's estate for more than two years before Arthurs was appointed, were not able, and did not attempt, to realize anything out of this purchase money. In simple truth there was nothing in it for the general creditors. Therefore it was not the duty of Mr. Arthurs to apply to the bankrupt court for an order to sell the property discharged of liens, (*In re Mebane*, 3 N. B. R. 347;) and if he had made such application it is very certain that it would have been denied, (Blum. Bankr. 292.) Nothing, then, remained to be done but to let the lien creditors sell the property, and Arthurs was guilty of no infidelity to the general creditors in applying to the bankrupt court for leave to proceed to sell upon his judgment in the state court. There is not anything in the evidence to warrant the register's conjecture that the judge who signed the order of June 21, 1879, was not fully advised as to its scope. Under the then existing circumstances there was nothing out of the way in granting to Arthurs permission to bid in his individual right at the sheriff's sale. It had come to be a mere matter of competitive bidding between incumbrancers, and it was right enough to put Arthurs on the same footing with the other lien creditors. That it was within the discretion of the court to make such order is not to be doubted.

Hill, Trustees, *536; *Campbell* v. *Walker*, 5 Ves. 678; *Dundas' Appeal*, 64 Pa. St. 325, 333. The order of the court is free from ambiguity. It stands unappealed from, and is not to be questioned collaterally.

At this point occurs the question, what appreciable difference did it make to the general creditors whether the property at the sheriff's sale brought $9,500 or $16,000, seeing that in either case the liens would have absorbed the entire proceeds? That the general creditors sustained any substantial loss by reason of the sale being made at the lesser of the named sums instead of at the larger is not apparent. There is no evidence whatever tending to show that the sheriff's sale was conducted otherwise than openly and fairly. That the highest bid was only $9,500 is not even a suspicious circumstance. Baum's title, to say the least of it, was most seriously clouded by reason of his conveyance to Hill and the sheriff's sale of Hill's title to the Pittsburgh National Bank of Commerce. The purchaser at the sheriff's sale under the Means & Nicholson judgment took a grave risk in view of the bank's adverse claim, undoubtedly. Arthurs was alive to this, and hence, when he came to convey to Cassius M. Carrier he was willing to warrant the title only to the extent of $11,000, as is fully explained in the testimony. But the register concluded that there was some sort of collusion between Arthurs, on the one hand, and E. G. Carrier and Cassius M. Carrier on the other, and in his report he states and comments upon the circumstances from which he deduces bad faith. This opinion, however, has grown to such a length that I must forbear to follow the register in that discussion, and I here content myself with saying that I am unable to assent to the register's reasoning or conclusion. I can discover no evidence to justify a finding of any fraud. It is true that before the sheriff's sale took place there was some conversation between Arthurs and Cassius M. Carrier about a sale by the former to the latter in the event of Arthurs' becoming the purchaser; but nothing was then definitely arranged, and in fact they never came to an agreement until August 7, 1880. It does not appear that they had any understanding not to bid against each other, or that they, or either of them, did anything to deter or mislead bidders or to repress competition at the sheriff's sale. There is not a *scintilla* of evidence to impeach the sheriff's sale on account of any misconduct on the part either of Arthurs or Carrier. It was freely open to any and every person to overbid Arthurs; and upon the whole I cannot perceive any just reason for depriving him of the fruits of a purchase which he was authorized to make by the order of the bankrupt court.

And now, to-wit, June 28, 1889, upon consideration, the exceptions to the register's report, in so far as they are in accordance with the foregoing opinion, are sustained, and the register's surcharges against the accountant are set aside, and it is decreed that the balance in the hands of the accountant, Richard Arthurs, is the sum of $275.78, and this sum he is ordered to pay to the present assignee, with interest from January 1, 1882; and it is further ordered that the costs of this proceeding be paid out of the funds of the estate of the bankrupt Baum.